UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


MICHAEL R. MITCHELL                    CIVIL ACTION


VERSUS                                 NO: 06-3746


CRESCENT RIVER PORT PILOTS             SECTION: "R"(5)
ASSOCIATION, ET AL.


**ORDER AND REASONS**

     Before the Court are defendants' motions to dismiss under

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the

following reasons, the Court GRANTS defendants' motions.


**I.   BACKGROUND**

     This lawsuit arises from the attempts of plaintiff Michael

R. Mitchell, an African-American man, to qualify for commission

as a river port pilot.  Mitchell alleges that, since 2001, he has

been continuously denied the opportunity to fairly compete for a

state appointment based on the discriminatory and unlawful

practices of the named defendants in this matter.[1]  More

_____

     [1] Plaintiff initially filed his complaint on July 14, 2006.
(R. Doc. 1).  Plaintiff then filed a supplemental and amended
complaint pursuant to Rule 15 of the Federal Rules of Civil

particularly, Mitchell asserts that the defendants, Allen J.
Gibbs, Jack H. Anderson, Donald J. Short, Scott A. Loga, Craig
Andrews, James E. Crammond, Crescent River Port Pilots
Association, and State of Louisiana Board of River Port Pilots
Commissioners, discriminated against him on account of his race
in violation of 42 U.S.C. §§ 1981, 1983, and 1985, as well as the
14th Amendment of the United States Constitution and Article I of
the Louisiana Constitution.  Mitchell further claims that Gibbs,
Anderson, Short, Loga, Andrews, and Crammond violated  42 U.S.C.
§ 1986.  Mitchell seeks compensatory and punitive damages,
declaratory and injunctive relief, and reasonable attorney's fees
and costs.  The named defendants now move to dismiss all of
plaintiff's racial discrimination claims under Rule 12(b)(6)
through three separate motions.  Additionally, Gibbs and the
Crescent River Port Pilots Association move to dismiss
plaintiff's claims under Section 1983 because neither party is a
"state actor" as contemplated by the statute.

## II.  LEGAL STANDARD

     Motions to dismiss under Federal Rule of Civil Procedure

---

Procedure on December 30, 2006.  (R. Doc. 40).  The motions at
issue here were submitted in response to plaintiff's original
complaint and subsequently re-urged as to plaintiff's
supplemental and amended complaint.

12(b)(6) are traditionally viewed with disfavor and are infrequently granted. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005) (citing *Shipp v. McMahon*, 199 F.3d 256, 260 (5th Cir. 2000)).  On a motion to dismiss, the court must accept all well-pleaded facts in the complaint as true and view those facts in the light most favorable to the plaintiff.  *See Baker v. Putnam*, 75 F.3d 190, 196 (5th Cir. 1996); *Am. Waste & Pollution Control Co. v. Browning-Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991).  The court must resolve doubts as to the sufficiency of the claim in the plaintiff's favor.  *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001).  The court need not, however, "'strain to find inferences favorable to the plaintiffs.'"  *Southland Sec. Corp. v. Inspire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (quoting *Westfall v. Miller*, 77 F.3d 868, 870 (5th Cir. 1996)).  Nor will it accept "conclusory allegations, unwarranted deductions, or legal conclusions."  *Id.; see also Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) ("[T]he plaintiff must plead specific facts, *not conclusory allegations*, to avoid dismissal.").

**III. DISCUSSION**

Four motions to dismiss plaintiff's claims are currently
pending before the Court.  They are: a motion to dismiss for
failure to state a claim by defendants Short and Loga (R. Doc.
52); a motion to dismiss for failure to state a claim by
defendants Anderson, Andrews, Crammond, and State of Louisiana
Board of River Port Pilots Commissioners (R. Doc. 51); and two
motions to dismiss for failure to state a claim by defendant
Crescent River Port Pilots Association and Gibbs (R. Docs. 49,
50).  Because each of these motions pertains to the same set of
allegations made by plaintiff in his supplemental and amended
complaint, the Court now briefly reviews these allegations,
accepting the well-pleaded facts as true for purposes of these
motions.

**A.   Plaintiff's Allegations**

Mitchell, a New Orleans resident, has been a first class
pilot of passenger vessels since 1996.  Mitchell alleges that,
since 2001, he has continuously applied for, and has been denied,
admission to the apprenticeship program that is a requirement to
become a river port pilot.  Under Louisiana law, river port
pilots

> have the exclusive right to pilot vessels on the
> Mississippi River between New Orleans, Louisiana and
> Pilottown, Louisiana and within the Port of New
> Orleans between Southport and Mereauxville; within
> the Industrial Canal, between the Mississippi River

> to and including Lake Pontchartrain; within the
> Intracoastal Canal, between the Industrial Canal and
> the turning basin at Michoud, inclusive; also for the
> Mississippi River Gulf Outlet between the Industrial
> Canal and Mile 28.3, the Gulf Intracoastal Waterway
> from the Louisiana-Mississippi state line to the
> Mississippi River Gulf Outlet, including Michoud Slip
> and Michoud Canal, Chef Pass, Algiers Cutoff, and the
> Harvey Canal; the Venice Jump within six and one-half
> miles of the Mississippi River; Bayou Savage; and
> Bayou Liberty.

La. Rev. Stat. § 34:996. The governor of Louisiana appoints and

commissions river port pilots, *see* La. Rev. Stat. § 34:992, after

they satisfy the conditions set forth in La. Rev. Stat. § 34:993.

Under that provision:

> Whenever there exists a necessity for more pilots as
> determined by the river port pilots, the Board of
> River Port Pilot Commissioners shall hold
> examinations under such rules and regulations and
> such requirements as they shall have provided, with
> the governor's approval; however, no applicant shall
> be considered by the board unless he submits proper
> evidence of moral character and is a voter of this
> state, and *shall have completed an approved
> apprenticeship program within the geographic area
> affected by this Subpart*. The Board of River Port
> Pilot Commissioners shall issue a certificate to the
> governor that the applicant has satisfied the
> requirements of this Subpart. The governor may then,
> in his discretion, appoint said applicant to existing
> vacancies.

La. Rev. Stat. § 34:993 (emphasis added).

Mitchell contends that his ultimately unfruitful efforts to

become a river port pilot began in November 2001. At that time,

Mitchell spoke with defendant Allen J. Gibbs, who is a river port

5

pilot and has been president of the Crescent River Port Pilots Association since at least 2001.[2]  Gibbs informed Mitchell in November 2001 to apply with the Association to become a river port pilot.  On November 27, 2001, defendant Jack H. Anderson, a river port pilot and the president of the Board of River Port Pilots Commissioners for the Port of New Orleans[3] since at least 2001, told Mitchell that he did not meet certain requirements to stand as a candidate to become a river port pilot.  Specifically, Mitchell did not hold a pilot's license for designated portions of the Mississippi River.  Seeking to meet these requirements, Mitchell asked Gibbs in December 2001 for permission to ride aboard piloted ships so that he could obtain his pilot's license

---

[2] The Crescent River Port Pilots Association, another defendant in this action, is made up exclusively of river port pilots, and its duties allegedly include election of apprentices as river port pilots by confidential ballot.  Louisiana law permits river port pilots to "form themselves into an association . . . not in conflict with law, or with the rules and regulations of the river port pilot commissioners . . . ."  La. Rev. Stat. § 34:995.

[3] The Board of River Port Pilots Commissioners for the Port of New Orleans, also a defendant here, is a statutorily created body, see La. Rev. Stat. § 34:991(A), that consists of three river port pilots who are appointed to be commissioners by the governor, with the consent of the state senate.  The governor designates the president of the board.  Id.  Under Louisiana law, the board is responsible for establishing qualifications of river port pilots, providing for the examination and approval of apprenticeship programs for the river port pilots, and administering the evaluation and examination of river port pilots.  See La. Rev. Stat. § 34:991(B).

6

for the necessary portions of the Mississippi River.  Gibbs
responded that the Association did not allow riders at that time
and suggested that Mitchell try again in early 2002.

On January 3, 2002, Mitchell reurged his request of Gibbs
that he be given permission to ride aboard piloted ships.
Mitchell also informed Gibbs at this time that three river port
pilots, Brian Falgout, Mark Grusich, and Billy Vogt, would permit
Mitchell to ride with them.  Gibbs responded that no riders were
allowed for insurance reasons.  He also told Mitchell that he
would ask the Association at its next meeting, which was
scheduled on either January 24 or 25, 2002, if it would allow
Mitchell to ride with the three river port pilots who had
indicated their interest in such an arrangement.  Gibbs never
responded to Mitchell during February and March of 2002 about
whether he could ride with the three river port pilots, despite
Mitchell's weekly phone calls to Gibbs.  On April 12, 2002,
Mitchell wrote Gibbs to inform him again that he knew of several
river port pilots who would allow Mitchell to ride with them, but
only if Gibbs gave his approval.  Gibbs allegedly never did so.
As a result, these pilots ultimately did not permit Mitchell to
ride with them.

In May 2002, Gibbs informed Mitchell that the Association
was drafting a waiver of liability form that river port pilots

7

would have to sign before Mitchell could ride with them.  Since
he did not receive this purported waiver form from the
Association for several months, Mitchell submitted an indemnity
agreement to the Association in August 2002 that had been drafted
by his attorney.  In response, Gibbs told Mitchell that the
proposed indemnity agreement was unsatisfactory.  Additionally,
Gibbs informed Mitchell that the Association could not grant
permission to ride on a ship piloted by a river port pilot.  In
September 2002, Mark Grusich, one of the pilots who had initially
expressed his willingness to allow Mitchell to ride with him,
told Mitchell that he would no longer be able to do so because of
the Association's policy that pilots could not allow prospective
apprentices to ride on a ship without first signing an indemnity
agreement.  Mitchell also contends that the other river pilots
who had indicated that they would allow Mitchell to ride with
them would not agree to do so after the Association instituted
the indemnity agreement policy.

On October 16, 2002, Errol Williams, an African-American
deputy pilot (*i.e.*, a first-year river port pilot), told Mitchell
that he would allow Mitchell to ride with him.  However, on
October 21, 2002, Williams informed Mitchell that he could not
allow Mitchell to ride with him because Anderson and Scott A.
Loga, also a Board commissioner at the time and a defendant in

this matter, had determined that, as a deputy pilot,[4] Williams was unable to permit Mitchell to ride with him.  Mitchell contends that, at the same time, the Board permitted white deputy pilots to take prospective apprentices on the vessels.  Mitchell also asserts that it was not until October 2003 that the State promulgated an administrative provision prohibiting deputy pilots from permitting observers to ride with them. *See* La. Admin. Code tit. 46 § 3301(A)(6) (2003) ("For the first year as a pilot, no persons are allowed on the bridge with the pilot with the exception of the bridge team, U.S. Coast Guard representatives, government officials, and the vessel's crew.").

On January 6, 2003, Gibbs told Mitchell that the Association had drafted an indemnity agreement that river port pilots were required to sign before observers could ride with them.  However, Mitchell did not obtain a copy of this agreement until May 2003. One month later, in June 2003, the Association held an election for river port pilot membership.  Mitchell, who was 38 years old at the time, was not on the ballot.  He contends that although six whites were elected to port pilot membership at that time, no African-American was elected.

On June 10, 2003, Mitchell sent a letter to the Board, with

_____

[4] Loga served as a commissioner on the Board until January of 2004.

9

attention specifically directed to Anderson, in which he
requested placement in the next apprenticeship program.  The
Association refused the letter three times.  On June 18, 2003,
Mitchell faxed the letter to the Board.  The Board never answered
this letter.  The letter stated that Mitchell required only 15
more trips aboard port pilot vessels to qualify for the ballot
and that these trips could be accomplished in less than 30 days.
The letter also indicated Mitchell's concern that the indemnity
agreement requirement had restricted pilots from allowing
Mitchell to ride as an observer and that his time to qualify was
running short, since the age limit to be elected as a river port
pilot is 40.  *See* La. Admin. Code tit. 46 § 3201(C) (2003) ("The
applicant must not have reached his fortieth birthday prior to
the first day of balloting on apprentices by the River Port
Pilots.").  On June 27, 2003, Mitchell faxed and mailed a letter
to the Board to the same effect as the one he had sent to the
Board earlier that month.  In his amended complaint, Mitchell
avers that this "letter was a formal complaint against the
Association for inhibiting his efforts to board ships with
Crescent Pilots as an observer since November 2001."  Mitchell
did not receive a response to this letter either.

On January 22, 2004, Mitchell wrote a letter to Gibbs and
defendant Donald Short, a river port pilot and Board

10

commissioner,[5] requesting that they notify all of the river port
pilots of Mitchell's desire to ride with them so that he could
obtain the 15 additional round-trip rides that he needed to meet
the licensure requirement.  On February 4, 2004, Gibbs informed
Mitchell that the Association would not disseminate Mitchell's
request to the port pilots; rather, the Association intended to
place copies of Mitchell's letter at the port pilots' office.
Mitchell contends that he was not granted an opportunity to ride
with any port pilot in the immediate aftermath of this request.
However, on September 26, 2004, Errol Williams, the only African-
American port pilot, completed his year as a deputy pilot, and
the Board then permitted Williams to allow Mitchell to ride with
him.

On May 20, 2005, Mitchell obtained his U.S. Coast Guard
Pilot License for all portions of the Mississippi River within
the river port pilots' geographical territory.  At that point,
Mitchell notified the Board that he had met its Coast Guard
licensing requirement.  On May 23, 2005, he personally delivered
documentation of this new license to the Board's office and
requested that his application for membership be reconsidered in

---

[5] It is unclear if this particular reference to Short in
Mitchell's amended complaint is in error, as Mitchell concedes
that Short left the Board in 2002.

light of this development.  On June 3, 2005, a representative of the Board informed Mitchell that the Board would notify him if it found his application incomplete for any reason.

On April 3, 2006, the Association held another election for river port pilot membership, and Mitchell's name was not placed on the ballot.  Mitchell asserts that five whites and no African-Americans were selected as new river port pilots at that time. An attorney for the Board allegedly told Mitchell that his name did not appear on the ballot because the Board did not have an application on file for him during the previous month.  Later, the commissioners of the Board, namely Anderson, Craig Andrews, and James Crammond,[6] told Mitchell that he was denied membership because he had turned 40 years of age in November of 2004, and thus he now exceeded the age limit for new river port pilots. *See* La. Admin. Code tit. 46 § 3201(C) (2003).  They also allegedly informed him that he was ineligible for election because he did not have licenses to pilot vessels on the Mississippi River-Gulf Outlet, Intracoastal Waterway, and Inner Harbor Navigation Canal.  Under the Louisiana Administrative Code, each applicant to become a river port pilot must hold these licenses.  *See* La. Admin. Code tit. 46 § 3203(A)(1) (2003).

---

[6] Andrews and Crammond, who are also defendants in this matter, had replaced Short and Loga on the Board by this time.

12

However, it also provides that "[i]n the event the Inner Harbor Navigation Canal is closed and or navigation on the canal is severely restricted, the board in its discretion may waive the requirement of a First Class Pilot License on all or part of the Inner Harbor Navigation Canal." *Id.*  Mitchell contends that the licensure requirement for these waterways should have been waived in the wake of Hurricane Katrina because ship traffic on them was "severely restricted" after the storm.  Mitchell also asserts that, before Katrina, traffic on these waterways was limited to the extent that he was unable to qualify for these licenses.  If the Board had waived those requirements, Mitchell argues that he would have been qualified to stand for election.

Following the April 2006 election, on the advice of members of the Board, Mitchell filed another application with the Board to become a river port pilot apprentice on April 27, 2006. Mitchell then filed this action on July 14, 2006.  He contends that members of the Board and the president of the Association intentionally prevented him from meeting the requirements to become a river port pilot on the basis of his race.  He asserts the following causes of action as a result of his failure to become a river port pilot between 2001 and the time that he filed suit: (1) that all of the defendants, individually and in concert, discriminated against Mitchell by denying him access to

13

the river port pilot apprenticeship program in violation of 42
U.S.C. §§ 1981 and 1983; (2) that all of the defendants,
individually and in concert, retaliated against Mitchell since
2002 because he complained of race discrimination, in violation
of 42 U.S.C. § 1981; (3) that the defendants, acting in concert,
conspired to intentionally deprive Mitchell of the equal
protection of the laws in violation of 42 U.S.C. § 1985; (4) that
Gibbs, Anderson, Short, Loga, Andrews, and Crammond violated 42
U.S.C. § 1986; (5) that all of the defendants violated the Equal
Protection Clause of the Fourteenth Amendment of the United
States Constitution in their application of the state statutes
governing the appointment of river port pilots; (6) that all of
the defendants violated the Due Process Clause of the Fourteenth
Amendment of the United States Constitution in their application
of the state statutes governing the appointment of river port
pilots; (7) that all of the defendants violated the Louisiana
Constitution by discriminating against Mitchell on the basis of
race.  Mitchell seeks compensation for past and future wage loss,
including benefits provided to river port pilots, compensatory
damages, punitive damages, costs, and an order that plaintiff
shall be hired as a river port pilot.

  B.  Defendants' Motions to Dismiss

The eight defendants in this action now move to dismiss plaintiff's federal claims.  All of the defendants assert that most, if not all of, plaintiff's claims have prescribed under the applicable statutes of limitations for claims of the type brought by plaintiff here.  In addition, they contend that Mitchell was never qualified to become a river port pilot during the relevant time period, and in fact remains unqualified today because he is not licensed for the Mississippi River-Gulf Outlet, Intracoastal Waterway, and Inner Harbor Navigation Canal.  Some of the defendants also argue that they are not "state actors" as required to state a claim under 42 U.S.C. § 1983.[7]  The Court addresses defendants' arguments below.

   1.   Prescription

Although 42 U.S.C. § 1981 contains no statute of limitations, the Supreme Court requires courts to apply a limitations period that is applicable to similar claims under state law.  *See Del. State Coll. v. Ricks*, 449 U.S. 250, 255 n. 5 (1980); *see also Braden v. Texas A&M Univ. Sys.*, 636 F.2d 90, 92 (5th Cir. 1981) ("federal courts apply the state law statute of

---

[7] Defendants filed their motions for dismissal as three separate groups: (1) Donald Short and Scott Loga; (2) Crescent River Port Pilots Association and Allen Gibbs; and (3) Board of River Port Pilots Commissioners, Jack Anderson, Craig Andrews, and James Crammond.

limitations governing an analogous state cause of action"). For Section 1981 claims in Louisiana alleging precontract misconduct, the Fifth Circuit applies Louisiana's one-year prescriptive period for torts. *Johnson v. Crown Enterprises, Inc.*, 398 F.3d 339, 341-42 (5th Cir. 2005) (distinguishing the recent holding in *Jones v. R.R. Donnelly & Sons Co.*, 541 U.S. 369 (2004), which mandated a four-year limitations period for Section 1981 claims, as applying only to conduct that occurs after contract formation, not to claims arising from the failure to enter into a new contract). For Section 1983 and Section 1985 claims in Louisiana, the Fifth Circuit applies the same one-year tort prescriptive period. *See Clifford v. Gibbs*, 298 F.3d 328, 332 (5th Cir. 2002) (stating that Louisiana's one-year statute of limitations for personal-injury actions applies to Section 1983 claims); *Burge v. Parish of St. Tammany*, 996 F.2d 786 (5th Cir. 1993) (affirming application of one-year prescriptive period to Section 1985 claim). Section 1986 specifically states that actions brought under that provision must be commenced within one year of when the cause of action has accrued. *See* 42 U.S.C. § 1986.

It is well-settled that "[a]lthough state law governs the substantive limitation[s] period, federal law determines when a civil rights action accrues and, therefore, when the statute of

16

limitations begins to run." *Perez v. Laredo Junior Coll.*, 706 F.2d 731, 733 (5th Cir. 1983); *see also Burrell v. Newsome*, 883 F.2d 416, 418 (5th Cir. 1989).  Under the applicable standard for both Section 1981 and Section 1983 claims, the limitations period begins to run "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (discussing Section 1983 claims) (quoting *Lavellee v. Listi*, 611 F.2d 1129, 1131 (5th Cir. 1980)); *Jones v. Alcoa, Inc.*, 339 F.3d 359, 364 (5th Cir. 2003) (holding the same for Section 1981 claims). Because plaintiff filed his lawsuit on July 14, 2006, defendants contend that his causes of action as they relate to defendants' alleged racial discrimination in their river port pilot apprenticeship election practices are necessarily limited to conduct that occurred on or after July 14, 2005.  As described above, the only asserted conduct that took place within this one-year period was the April 2006 election for which the river port pilots did not place Mitchell's name on the ballot.

Although Mitchell acknowledges the applicability of the one-year prescriptive period in Louisiana for claims under 42 U.S.C. § 1981, he argues that the entirety of the defendants' conduct dating back to 2001 is properly subject to challenge under the "continuing violation" theory.  This doctrine provides "that where the last act alleged is part of an ongoing pattern of

17

discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred." *McGregor v. Louisiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 866 (5th Cir. 1993).  In other words, "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable period, if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir. 2004).  Courts have utilized the theory of continuing violation in certain exceptional circumstances.  *See Webb v. Cardiothoracic Surgery Assoc. of N. Texas, P.A.,* 139 F.3d 532, 537 (5th Cir. 1998) (citing *Messer v. Meno*, 130 F.3d 130, 134-35 (5th Cir. 1997)).  To find a continuing violation, the court must consider whether the discriminatory acts involve the same type of discrimination, the frequency of the acts, and whether the acts involve a "degree of permanence which should trigger an employee's awareness and duty to assert his or her rights[.]"  *Berry v. Bd. of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983).  As the Fifth Circuit has stated:

> The end goal of the continuing violation theory is to "accommodate plaintiffs who can show that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all of the

> discriminated acts committed as part of this pattern
> or policy can be considered timely."

*Pegram*, 361 F.3d at 279 (quoting *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 352 (5th Cir. 2001)).

The Supreme Court recently addressed the continuing violation theory in the context of discrimination claims. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). In *Morgan*, the Court overruled the Ninth Circuit's application of the continuing violation theory to discrete discriminatory acts. The Court held that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id*. at 114. Notably, the Supreme Court did not overrule the Fifth Circuit's multi-factor test to determine the applicability of the continuing violation doctrine. *See id*. at 107. The Court held that a discrete act "occurred" on the day that it "happened," and therefore the time period for filing a charge begins on the date of the act. *See id*. at 110. Further discrete discriminatory acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Pegram*, 361 F.3d at 279.

Plaintiff contends that *Morgan* is inapplicable to this case

because the plaintiff in *Morgan* sued under Title VII, whereas he has sued under 42 U.S.C. 1981, *et seq*.  This distinction has not been recognized by the Fifth Circuit or by other courts that have addressed *Morgan*'s applicability to claims under 42 U.S.C. 1981, *et seq*.  In *Pegram*, the Fifth Circuit applied *Morgan* to hold that the continuing violations theory did not save plaintiff's Section 1981 claims.  361 F.3d at 280.  As to claims under Section 1983, the Third, Sixth, Seventh, and Ninth Circuits have each applied *Morgan* in that context.  *See O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006); *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003); *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1061 (9th Cir. 2002); *see also Price v. Jefferson County*, 470 F. Supp. 2d 665, 682-86 (E.D. Tex. 2006). Further, the Third Circuit stated in *O'Connor* that "*Morgan* applies to [claims under Sections 1985 and 1986] just as it does to Section 1983."  440 F.3d at 129.  In the face of the substantial authority supporting the application of *Morgan* to claims under 42 U.S.C. 1981, *et seq.*, plaintiff presents the Court with no caselaw holding otherwise.

Because under *Morgan* the continuing violation theory does not apply to discrimination claims based on discrete acts, plaintiff's claims as they relate to conduct that occurred

leading up to and during the June 2003 election for new river port pilots is time-barred.  The June 2003 election, an event akin to a refusal to hire Mitchell by the defendants, was undoubtedly a discrete act as contemplated by the *Morgan* decision.  Likewise, under the third factor of the *Berry* test, the June 2003 election was an act of sufficient permanence that it should have triggered Mitchell's awareness of and duty to assert his rights.  In fact, as discussed above, Mitchell sent what he called a "formal complaint" to the Association in the aftermath of the June 2003 election detailing the extent to which he believed he had been frustrated in his efforts since November 2001 to gain the necessary qualifications to become a river port pilot.  Thus, it is clear from the face of Mitchell's complaint that he believed in June 2003 that this election was the culmination of a one-and-a-half-year effort to prevent him from standing for election as a river port pilot.  The continuing violation theory does not save these claims because the 2003 and 2006 river port pilot elections, though similar in nature in satisfaction of the first *Berry* factor, are nevertheless separate incidents.  As the Supreme Court stated in Morgan, "discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period."  *Id.* at 112.

In a factually similar case, the Southern District of Texas

reached the same conclusion as the Court does here.  In *Edwards v. Galveston-Texas City Pilots*, 203 F. Supp. 2d 759 (S.D. Tex. 2002), the plaintiff, an African-American man, unsuccessfully sought election for a deputy pilot position with a group of maritime pilots, Galveston-Texas City Pilots.  He alleged racial discrimination under Sections 1981, 1985, and 1986, as well as other claims.  He brought claims in 2001 arising out of his failure to gain election in both 1999 and 2000.  The court found that plaintiff's claims under the federal statutes as they related to the 1999 election were time-barred because plaintiff did not file his lawsuit within the two-year statutory period authorized by Texas law for the Section 1981 and 1985 claims and within the one-year period for the Section 1986 claim.  *Id.* at 765.  In doing so, the court determined that the 1999 election constituted a specific discriminatory act.  *Id.* at 766 (relying on *Ricks*, 449 U.S. at 250, for the proposition that a discrete employment action occurs when the failure to hire takes place, not when plaintiff feels the consequences of the action).  The court, citing *Berry*, also rejected plaintiff's attempt to link the 1999 election with the 2000 election (which did occur within the limitations period) under the continuing violation theory.  *Id.* at 767.  The court found that the elections were "two entirely isolated and independent discriminatory acts . . . both

22

possessing the necessary degree of permanence to have triggered [plaintiff's] awareness of his rights." *Id.*

Recently, a court in this district dismissed similar federal civil rights claims based on Louisiana's one-year prescription period.  In *Caire v. Crescent River Port Pilots Association, et al.*, Civ. Action No. 04-1244, the plaintiff asserted that he had been systematically deprived of the opportunity to compete for a river port pilot's commission through the defendants' unlawful discrimination.  The Court dismissed plaintiff's claims that had occurred more than one year before the date on which the plaintiff filed suit.  *Caire*, Civ. Action No. 04-1244, R. Doc. 9, Oct. 4, 2004.

For the foregoing reasons, the Court dismisses all of the plaintiff's claims in this matter that are specifically premised on defendants' conduct leading up to and including the June 2003 election, as those claims are time-barred.  This necessarily means that Mitchell cannot state a claim under federal law against either Donald Short or Scott Loga because these defendants completed their service as commissioners on the Board, at the latest, in January 2004.  The allegations in the amended complaint as to these two defendants relate only to the June 2003 election.  The Court therefore grants the motion to dismiss filed by Short and Loga. The Court will address Mitchell's claims of

23

discrimination against the remaining defendants arising from the 2006 election in the following sections.

        *2.   Mitchell's Eligibility*

Between the 2003 and 2006 elections, Mitchell argues that the racially discriminatory actions of the remaining defendants resulted in his not being a candidate for election as a river port pilot in April 2006.  As noted above, the April 2006 election was a discrete act, in that a refusal to hire occurred at that time, and it was obviously within the one-year period before Mitchell filed suit.  Thus, Mitchell is not time-barred from making a claim that he was a victim of intentional discrimination on the basis of race by virtue of the remaining defendants' conduct leading up to and including the April 2006 election.

Defendants contend that Mitchell's ineligibility to become a river port pilot in April 2006 forecloses him from establishing a prima facie case of racial discrimination under Section 1981, showing that he was deprived of a right or interest guaranteed by the Constitution and laws of the United States under Section 1983, or demonstrating that he was deprived of the equal protection of the laws as part of a conspiracy under Sections 1985 and 1986 as a result of the 2006 election.  Defendants rely on La. Admin. Code tit. 46 § 3201(C), which, as noted earlier,

provides: "The applicant must not have reached his fortieth birthday prior to the first day of balloting on apprentices by the River Port Pilots." It is undisputed that Mitchell turned 40 in November 2004, approximately seventeen months before the April 2006 election.

The Fifth Circuit has stated that race discrimination claims in the employment context brought under Sections 1981[8] and 1983[9] are analyzed in the same manner as a claim for race discrimination under Title VII of the 1964 Civil Rights Act, with

---

[8] Section 1981 provides as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . .

42 U.S.C. § 1981(a).

[9] Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

the exception of their respective statutes of limitation, and the requirement under Title VII that the plaintiff exhaust all administrative remedies.  *See Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).  A plaintiff in a racial discrimination case brought under these statutes can use either direct or circumstantial evidence to prove a case of intentional discrimination.  *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994).  The Fifth Circuit has noted that direct evidence is rare in cases such as this one.  *See id.*  "Direct evidence is evidence which, if believed, proves the fact of [intentional discrimination] without inference or presumption."  *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993).  The Fifth Circuit has defined "direct evidence" as including "any statement or written document showing a discriminatory motive on its face."  *Portis*, 34 F.3d at 329 (citing *Vaughn v. Edel*, 918 F.2d 517, 521 (5th Cir. 1990).  Under the framework set forth in *McDonnell Douglas Corp. v. Green*, a plaintiff may use circumstantial evidence to "carry the initial burden . . . of establishing a prima facie case of racial discrimination."  411 U.S. 792, 802 (1973). Plaintiff can establish a prima facie case in the discrimination context once he has proved that he: (1) is a member of a

26

protected class; (2) was qualified and applied for the position; (3) was rejected for the job; and (4) the employer continued to seek applicants with plaintiff's qualifications.  *See Adams v. Reed*, 567 F.2d 1283, 1285 (5th Cir. 1978).  For both direct and circumstantial evidence cases, "[b]eing qualified for the position sought is a *sine qua non* of a claim for racial discrimination . . . .  A person who is not qualified . . . does not have standing to complain of invidious racial animus."  *Peguese v. Borup*, 144 F. Supp. 2d 743, 747-48 (S.D. Tex. 2001), *aff'd*, 33 Fed. Appx. 704 (5th Cir. 2002).

Here, Mitchell's disqualification because of his age is fatal to his discrimination claims under Sections 1981 and 1983, regardless whether Mitchell intended to use direct or circumstantial evidence to prove racial discrimination.[10]  Under the Louisiana Administrative Code, Mitchell was no longer qualified to stand for election as a river port pilot apprenticeship once he turned forty years old in November 2004.[11]

---

[10] The Court need not address the "state actor" issue in the context of plaintiff's first Section 1983 claim (the denial of his opportunity to fairly compete for a state commission as a river port pilot, *see* R. Doc. 40, ¶ 66) because this claim is not valid in any event.

[11] In his opposition to defendants' motions to dismiss, plaintiff suggests that the age requirement imposed by La. Admin. Code tit. 46 § 3201(C) is waivable.  Plaintiff however provides no authority establishing that state law allows the age

In other words, he was legally prohibited from becoming an apprentice.  *Cf. id.* at 748 (granting summary judgment in favor of Galveston-Texas City Pilots on plaintiff's racial discrimination claim because defendants were "legally barred from selecting him" as deputy port pilot).  For this same reason, Mitchell's racial discrimination claim under Section 1985 is likewise without merit.[12]  The apparent basis of that claim is the alleged intentional racial discrimination at the heart of

---

requirement to be waived.  Nor does plaintiff allege any incidence when the requirement was waived or that he was ever told by any of the defendants that the requirement was waivable. Plaintiff's bare assertion is therefore unavailing in light of the plain language of La. Admin. Code tit. 46 § 3201(C).

   [12] Section 1985 reads, in pertinent part:

   If two or more persons in any State or Territory
   conspire . . . for the purpose of depriving, either
   directly or indirectly, any person or class of
   persons of the equal protection of the laws, or of
   equal privileges and immunities under the laws; . . .
   or to injure any citizen in person or property on
   account of such support or advocacy; . . . if one or
   more persons engaged therein do, or cause to be done,
   any act in furtherance of the object of such
   conspiracy, whereby another is injured in his person
   or property, or deprived of having and exercising any
   right or privilege of a citizen of the United States,
   the party so injured or deprived may have an action
   for the recovery of damages occasioned by such injury
   or deprivation, against any one or more of the
   conspirators.

42 U.S.C. § 1985(3).

Mitchell's Sections 1981 and 1983 claims.[13]  Since Mitchell
cannot complain of racial discrimination because he was legally
ineligible for a river port pilot commission during the one-year
actionable period in this case, he is also unable to set forth a
viable Section 1985(3) claim.  Moreover, Mitchell's Section 1986
must fail.[14]  *See Hagardon v. Hingle*, 2003 WL 22174273, at *3
(E.D. La. Sept. 11, 2003) ("Because plaintiffs failed to state a
cognizable claim under Section 1985, they may not recover under
the interrelated, dependant cause of action under Section 1986.")
(citing *Galloway v. Louisiana*, 817 F.2d 1154, 1159 n.2 (5th Cir.
1987)).

        Finally, Mitchell's retaliation claim under Section 1981
also fails because of his ineligibility at the time of the April

_____

        [13] In his amended complaint, Mitchell asserts his claim
under Section 1985(3) in conjunction with his Section 1983 claim.
(R. Doc. 40, at 13-14).

        [14] Section 1986 provides in pertinent part:

        Every person who, having knowledge that any of the
        wrongs conspired to be done, and mentioned in section
        1985 of this title, are about to be committed, and
        having power to prevent or aid in preventing the
        commission of the same, neglects or refuses so to do,
        if such wrongful act be committed, shall be liable to
        the party injured, or his legal representatives, for
        all damages caused by such wrongful act, which such
        person by reasonable diligence could have
        prevented[.]

42 U.S.C. § 1986.

2006 election.  To prove a prima facie retaliation case under
Section 1981, a plaintiff must show: (1) that he engaged in
protected activity; (2) that he suffered an adverse employment
action; and (3) that a causal connection exists between the
protected activity and the adverse employment action.  *Byers v.
Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).
"The ultimate determination is whether, 'but for' the protected
conduct, the employer would not have engaged in the adverse
employment action."  *Douglas v. DynMcDermott Petroleum Operations
Co.*, 144 F.3d 364, 372 (5th Cir. 1998).  The Court finds that
plaintiff cannot state a retaliation claim because this conduct
was clearly not the "but for" cause of defendants' adverse
employment action, *i.e.*, the refusal to permit Mitchell to stand
for election in April 2006.  At that point, Mitchell was legally
barred from doing so.

     3.   *Official Custom or Policy Claim*

What remains of Mitchell's federal claims at this point is
his vague allegation that defendants utilized state law governing
the selection and commissioning of river port pilots (namely, La.
Rev. Stat. 34:991 *et seq.*) in a manner that promotes and allows
the unlawful exclusion of qualified African-American pilots in
violation of Section 1983.  (R. Doc. 40, at ¶ 67).  Broadly
construing plaintiff's complaint in his favor, the Court reads

this allegation as a claim under Section 1983 seeking to impose liability on a local government entity for a custom or policy that deprived Mitchell of his constitutional right to compete for a river port pilot's commission free from racial discrimination. *See generally Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  As the Fifth Circuit has stated:

> To support a claim based upon the existence of an official custom or policy, the Plaintiff must plead facts which show that: 1) a policy or custom existed; 2) the governmental policy makers actually or constructively knew of its existence; 3) a constitutional violation occurred; and 4) the custom or policy served as the moving force behind the violation.

*Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532-33 (5th Cir. 1996).

Putting aside, again, the disputed issue of whether any of these defendants qualify as "local government entities" or "state actors" for purposes of Section 1983 liability, Mitchell still cannot state a claim based on a custom or policy theory.  As discussed earlier, the Fifth Circuit applies Louisiana's one-year prescriptive period for torts to claims brought under Section 1983.  *See Clifford*, 298 F.3d at 332.  Mitchell thus cannot rely on allegations related to the June 2003 election to show that defendants had in place a policy or custom designed to prevent him from attaining the proper qualifications to become a river

port pilot before he turned forty years of age.[15]  Mitchell

concedes that he knew in June 2003, at the time of the first

election at issue here, that defendants' alleged misconduct was

jeopardizing his opportunity to be elected before he turned

forty.  For his claims related to the June 2003 election to have

been timely, Mitchell should have sued, at the latest, within one

year of turning forty in November 2004, as he was clearly aware

of defendants' alleged policy or custom by then.  The only

relevant action then that falls within the one-year prescriptive

period is the April 2006 election.  However, this Court has

already determined, *supra*, that Mitchell was legally ineligible

to gain election as a river port pilot at the time of the April

2006 election.  Because Mitchell has not alleged any custom or

policy perpetrated by the remaining defendants that actually

caused him any harm during the one-year prescriptive period under

Section 1983, his *Monell* claim necessarily fails.  *See, e.g.,*

*Bell v. Fowler*, 99 F.3d 262, 269 (8th Cir. 1996) ("[T]here must

be some evidence of unconstitutional misconduct or a custom of

---

[15] Notably, plaintiff's amended complaint contains no
factual allegations as to any other African-Americans who may
have been denied their right to compete for a river port pilot
position free from racial discrimination.  It was only after
defendants' filed these motions to dismiss that submitted the
declaration of Terry Coleman in an untimely attempt to bolster
his policy or custom theory.  (R. Doc. 53).

failing to act on complaints that caused Bell harm subsequent to July 13, 1991 (to be within three years of when she filed her cause of action), in order to satisfy the statute of limitations.").

It is for this reason that Mitchell's reliance on *Manthey v. New Orleans and Baton Rouge Steamship Pilots Association, et al.*, Civ. Action No. 02-470 c/w 02-956, is misplaced.  There, the plaintiff was a woman who alleged that she was denied a commission as a steamship pilot on the basis of the defendants' discriminatory custom and policy of excluding females as manifested in plaintiff's failure to receive a commission in the 1988, 1994, and 2001 elections held by the New Orleans and Baton Rouge Steamship Pilots Association.  The court denied the defendants' motion for summary judgment as to plaintiff's claims for discrimination arising from the 1988 and 1994 elections, even though both elections occurred more than one year before plaintiff brought suit.  The court apparently permitted plaintiff to rely on the 1988 and 1994 elections to show a pattern of similar incidents of gender discrimination in the selection of steamship pilots.  *Id*.  The court did not rely on any authority for its ruling that plaintiff's discriminatory policy claims arising from the 1988 and 1994 elections had not prescribed.  In any event, in that case, it was undisputed that the 2001 election

33

in which plaintiff was allegedly denied election based on her
gender – in other words, an overt act of discrimination that
allegedly caused harm to plaintiff – occurred within the one-year
limitation period for Section 1983 claims.  Here, Mitchell has no
actionable claim arising from conduct that occurred within the
prescriptive period.

Accordingly, the Court must dismiss Mitchell's Section 1983
claim based on an asserted policy or custom of racial
discrimination.  Mitchell therefore fails to state a viable claim
against any of the remaining defendants under the federal civil
rights statutes.  Given the seriousness of plaintiff's claims and
the defendants' allegedly deficient record of including African-
Americans in their number, the Court would have welcomed the
opportunity to permit plaintiff to go forward with discovery as
to defendants' alleged misconduct.  This ruling is nonetheless
the proper conclusion in light of the one-year prescriptive
period and the qualifications for river port pilots as set forth
by Louisiana law.

### 4.  *Plaintiff's State Law Claims*

Plaintiff also asserts claims under the Louisiana
Constitution arising from the same set of facts, which defendants
also move to dismiss at this stage.  A federal court may decline
to exercise supplemental jurisdiction when it has dismissed the

34

claims on which its original jurisdiction was based.  *See* 28
U.S.C. § 1367(c)(3).  The general rule is that district courts
should decline jurisdiction over state law claims when all
federal claims are dismissed, *Smith v. Amedisys Inc.*, 298 F.3d
434, 447 (5th Cir. 2002), and the Court has wide discretion to do
so.  *See Guzzino v. Felterman*, 191 F.3d 588, 594-95 (5th Cir.
1999).  Here, the Court has now dismissed all of plaintiff's
federal claims against all of the defendants.  No independent
basis exists for jurisdiction on the state law claims against
those defendants.  The state law claims involve issues of state
law that comity principles indicate state courts should decide in
the first instance.  The Court therefore finds that the rule
counseling against the exercise of supplemental jurisdiction over
state law claims when federal claims have been dismissed applies
in this situation, and the Court dismisses plaintiff's state law
claims without prejudice.


**IV.  CONCLUSION**

     For the foregoing reasons, the Court GRANTS defendants'
motions to dismiss plaintiff's claims under 42 U.S.C. § 1981 *et
seq*. with prejudice.  Plaintiff's state law claims are dismissed
without prejudice.

New Orleans, Louisiana, this __1st__ day of June, 2007.


_____
            SARAH S. VANCE
    UNITED STATES DISTRICT COURT